# No. 24-382

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

---

FARM SANCTUARY; ANIMAL EQUALITY; and ANIMAL OUTLOOK,

*Plaintiffs-Appellants,*

CENTER FOR BIOLOGICAL DIVERSITY; COMPASSION OVER KILLING; MERCY FOR ANIMALS, INC.; NORTH CAROLINA FARMED ANIMAL SAVE; ANIMAL LEGAL DEFENSE FUND,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, FOOD SAFETY AND INSPECTION SERVICE,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Western District of New York

---

### BRIEF FOR APPELLEE USDA

---

*Of Counsel:*


BRIGHAM J. BOWEN
  *Associate General Counsel*
  *U.S. Department of Agriculture*

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MICHAEL DIGIACOMO
  *United States Attorney*

THOMAS PULHAM
BENJAMIN M. SHULTZ
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3518*
  *Benjamin.Shultz@usdoj.gov*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................... 1

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE CASE .......................................................................... 2

      A.    Statutory And Regulatory Background ......................................... 2

      B.    Factual Background ....................................................................... 6

      C.    Prior Proceedings ....................................................................... 11

SUMMARY OF ARGUMENT ....................................................................... 15

STANDARD OF REVIEW .............................................................................. 19

ARGUMENT ..................................................................................................... 19

I.    Plaintiffs Lack Article III Standing ..................................................... 19

      A.    Plaintiffs Lack Organizational Standing ..................................... 20

      B.    Plaintiff's Lack Associational Standing ...................................... 26

II.    The Challenged Rule Complies With Governing Statutes And
Does Not Unlawfully Delegate Any USDA Responsibilities .............................. 30

      A.    The Challenged Rule Complies With The Federal Meat
Inspection Act And Does Not Unlawfully Delegate USDA's
Responsibilities ........................................................................... 30

      B.    The Challenged Rule Complies With The Humane Methods
Of Slaughter Act ......................................................................... 38

III.    USDA Did Not Act Arbitrarily And Capriciously In Promulgating
The New Rule's Ante-Mortem Provision ............................................ 40

i

CONCLUSION ........................................................................................................... 53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** <u>Page(s)</u>

*American Fed'n of Gov't Emps. v. Glickman,*
215 F.3d 7 (D.C. Cir. 2000) ............................................................ 7

*American Fed'n of Gov't Emps. v. Veneman,*
284 F.3d 125 (D.C. Cir. 2002) ......................................................... 7

*Baur v. Veneman,*
352 F.3d 625 (2d Cir. 2003) .......................................................... 29

*Bochner v. City of New York,*
118 F.4th 505 (2d Cir. 2024) ......................................................... 19

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
868 F.3d 104 (2d Cir. 2017) .......................................................... 24

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................... 17, 28, 29

*Clark v. Rameker,*
573 U.S. 122 (2014) ...................................................................... 31

*Connecticut Parents Union v. Russell-Tucker,*
8 F.4th 167 (2d Cir. 2021) ......................................................... 21, 22

*Dibble v. Fenimore,*
545 F.3d 208 (2d Cir. 2008) .......................................................... 42

*Farm Sanctuary v. USDA*:
545 F. Supp. 3d 50 (W.D.N.Y. 2021) ............................................. 11
706 F. Supp. 3d 381 (W.D.N.Y. 2023) .......................... 13, 14, 15, 42

*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ............................................. 13, 16, 21, 23, 24

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ................................................................ 23, 24

iii

*Karpova v. Snow,*
   497 F.3d 262 (2d Cir. 2007) ........................................................... 41

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ....................................................................... 32

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .................................................................. 20, 28

*Murphy v. Hughson,*
   82 F.4th 177 (2d Cir. 2023) ........................................................... 19

*National Meat Ass'n v. Harris,*
   565 U.S. 452 (2012) .................................................................. 34, 35

*Natural Res. Def. Council, Inc. v. Muszynski,*
   268 F.3d 91 (2d Cir. 2001) ............................................................. 19

*New York Civil Liberties Union v. New York City Transit Auth.,*
   684 F.3d 286 (2d Cir. 2012) ....................................................... 20, 21

*Nnebe v. Daus,*
   644 F.3d 147 (2d Cir. 2011) ........................................................... 24

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .................................................................. 19, 29

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.,*
   517 U.S. 544 (1996) ....................................................................... 26

*United Food & Commercial Workers Union, Local No. 663 v. USDA,*
   532 F. Supp. 3d 741 (D. Minn. 2021) ............................................. 12

*United States v. Wilson,*
   503 U.S. 329 (1992) ....................................................................... 31

*Zarnel, In re,*
   619 F.3d 156 (2d Cir. 2010) ........................................................... 24

iv

**Statutes:**

Act of June 30, 1906, ch. 3913, 34 Stat. 669 ..................................... 32, 36

Act of Mar. 4, 1907, ch. 2907, 34 Stat. 1260 ............................... 2, 32, 36

Administrative Procedure Act:
  5 U.S.C. § 706 ........................................................................... 19
  5 U.S.C. § 706(2)(A) ................................................................. 41

Federal Meat Inspection Act:
  21 U.S.C. § 603(a) ............................... 2, 3, 17, 30, 31, 32, 38, 40
  21 U.S.C. § 604 ........................................................................... 3
  21 U.S.C. § 610(b) ................................................................... 35
  21 U.S.C. § 621 ........................................................................... 3
  21 U.S.C. § 678 .................................................................. 34-35

Humane Methods of Slaughter Act of 1958,
  Pub. L. No. 85-765, 72 Stat. 862 ........................................... 6
    7 U.S.C. §§ 1901-1906 ....................................................... 6
    7 U.S.C. § 1902 ................................................................... 6
    7 U.S.C. § 1904 ................................................................... 6
    21 U.S.C. § 603(b) .................................................. 6, 35, 38, 40

Wholesome Meat Act,
  Pub. L. No. 90-201, § 3(b), 81 Stat. 584, 588 (1967) .......... 2, 33

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

49 U.S.C. § 80502 ..................................................................... 48

**Regulations:**

9 C.F.R. § 303.1(h) ..................................................................... 7

9 C.F.R. pts. 309-310 (1971) ...................................................... 3

9 C.F.R. § 309.1 (2018) .............................................................. 33

9 C.F.R. § 309.1 ................................................................ 3, 10, 33, 40

9 C.F.R. § 309.1(a) ........................................................................ 49

9 C.F.R. § 309.1(a)-(b) (1967) ..................................................... 33

9 C.F.R. § 309.1(a)-(b) ................................................................. 33

9 C.F.R. § 309.2 .............................................................................. 4

9 C.F.R. § 309.19 ............................................................................ 9

9 C.F.R. § 309.19(a) ..................................................................... 50

9 C.F.R. § 309.19(a)-(c) ................................................................. 9

9 C.F.R. § 309.19(b)-(e) ............................................................... 50

9 C.F.R. § 309.19(d) ....................................................................... 9

9 C.F.R. § 309.19(e) ....................................................................... 9

9 C.F.R. § 309.49(c)-(d) ............................................................... 37

9 C.F.R. § 309.49(e) ..................................................................... 37

9 C.F.R. § 310.1(a) .......................................................................... 5

9 C.F.R. § 310.1(b)(1) ..................................................................... 5

9 C.F.R. § 310.1(b)(3)(i) ................................................................. 9

9 C.F.R. § 310.1(b)(3)(ii) ............................................................... 5

9 C.F.R. § 310.26 ............................................................................ 9

9 C.F.R. § 310.26(b) ..................................................................... 10

9 C.F.R. § 310.26(d) ..................................................................... 10

9 C.F.R. § 313.2 ............................................................................ 49

9 C.F.R. § 417.2 ................................................................................................ 28

**Other Authorities:**

Bureau of Animal Indus., USDA, *BAI Order 211: Regulations Governing
the Meat Inspection of the United States Department of Agriculture* (July 30, 1914),
https://perma.cc/95KZ-8MSB ................................................................ 32, 33, 36

35 Fed. Reg. 15552 (Oct. 3, 1970) ...................................................................... 33

61 Fed. Reg. 38806 (July 25, 1996) ...................................................................... 7

62 Fed. Reg. 31553 (June 10, 1997) ................................................................... 6, 7

83 Fed. Reg. 4780 (Feb. 1, 2018) ................................... 4, 5, 6, 7, 8, 9, 10, 27, 41,
43, 44, 45, 46, 50, 52

84 Fed. Reg. 52300 (Oct. 1, 2019) ................................... 3, 9, 10, 11, 25, 27, 39, 41, 43,
44, 45, 46, 50, 51, 52, 53

Office of Inspector Gen., USDA, *Food Safety and Inspection Service Followup
on the 2007 and 2008 Initiatives: Audit Report 24016-0001-23* (June 2017),
https://perma.cc/CFP7-XCKG ................................................................ 46

USDA:
*Constituent Update – January 10, 2025*,
https://www.fsis.usda.gov/news-events/news-press-releases/constituent-
update-january-10-2025 ........................................................................... 12
*Constituent Update – March 21, 2025*,
https://www.fsis.usda.gov/news-events/news-press-releases/constituent-
update-march-21-2025 ............................................................................. 12
*Special Alert: Constituent Update – November 28, 2023*,
https://www.fsis.usda.gov/news-events/news-press-releases/special-alert-
constituent-update-november-28-2023 ................................................... 12

## STATEMENT OF JURISDICTION

In their operative complaint, plaintiffs challenged a regulation promulgated by the United States Department of Agriculture (USDA), and they invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA12-13.[1] All parties stipulated to the dismissal of some of plaintiffs' claims, *see* JA1105, and the district court granted summary judgment to the government on the remainder, *see* JA9. Final judgment issued on December 13, 2023, JA9, and four plaintiffs timely filed a notice of appeal on February 12, 2024, JA1108. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

After the appeal was docketed, this Court granted plaintiff Animal Legal Defense Fund's motion to withdraw as a party. The remaining three plaintiffs lack Article III standing to pursue this case—as explained more fully below—and the district court accordingly lacked subject matter jurisdiction over their claims.

## STATEMENT OF THE ISSUES

USDA conducts both ante-mortem and post-mortem inspections of hogs slaughtered for food. In 2019, USDA promulgated a rule that allows slaughter plants to opt into a new and more efficient inspection system. Almost all the differences between the new and old systems relate to post-mortem inspections. Under both systems, USDA inspectors (1) do an ante-mortem inspection of every hog plants

---

[1] Citations to pages in the Joint Appendix are abbreviated "JA[page]."

decide to slaughter for food, and (2) do not inspect some hogs that plants voluntarily sort out before USDA's inspection. The questions presented are the following:

1) Whether the plaintiff animal rights groups, who are not themselves regulated by USDA's rule, have Article III standing to bring their claims.

2) Whether the ante-mortem provision in USDA's rule is consistent with governing statutes.

3) Whether USDA acted arbitrarily and capriciously in promulgating the rule's ante-mortem provision.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background

1.  In its current form, the Federal Meat Inspection Act directs USDA to use government "inspectors" to make "an examination and inspection of all . . . species [amenable to slaughter] before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce."  21 U.S.C. § 603(a); *see also* Wholesome Meat Act, Pub. L. No. 90-201, § 3, 81 Stat. 584, 588 (1967) (amending Act of Mar. 4, 1907, ch. 2907, 34 Stat. 1256, 1260).  The statute further provides that if animals are "found on such inspection to show symptoms of disease," those animals must be "set apart and slaughtered separately," and their carcasses "shall be subject to a careful examination and inspection."  21 U.S.C. § 603(a).

2

Procedures for these "ante-mortem" (before slaughter) inspections, and for the slaughtering of diseased animals identified through these inspections, are to follow "the rules and regulations . . . prescribed by" USDA for these purposes. 21 U.S.C. § 603(a). A separate statutory provision directs USDA to "make such rules and regulations as are necessary for the efficient execution of the provisions of" the Federal Meat Inspection Act. *Id.* § 621.

The Federal Meat Inspection Act also directs USDA inspectors to make "a post mortem examination and inspection of the carcasses and parts thereof" of animals prepared at slaughtering establishments as "articles of commerce which are capable of use as human food." 21 U.S.C. § 604. Carcasses and parts that inspectors conclude are "adulterated" are marked as condemned, at which point the establishment must "destroy[]" those carcasses or parts "for food purposes." *Id.*

2. For many years, USDA regulations required swine slaughterhouses to use what was known as the "traditional" inspection system. *See* 84 Fed. Reg. 52300, 52301 (Oct. 1, 2019); 9 C.F.R. pts. 309-310 (1971). That system begins with an ante-mortem inspection of "[a]ll [swine] offered for slaughter" by a slaughtering establishment, which inspection "shall be made on the premises of the establishment . . . before the [swine] shall be allowed to enter into any department of the establishment" where the swine "are to be slaughtered or dressed or in which edible products are handled." 9 C.F.R. § 309.1. If inspectors conclude that an animal shows

3

visible signs of disease or other condemnable conditions, the animal must be set apart for slaughter separately. *See id.* § 309.2; 83 Fed. Reg. 4780, 4783 (Feb. 1, 2018).

Historically, many swine plants using the traditional system have "voluntarily segregate[d] animals that show signs of diseases or conditions from healthy animals before" USDA inspectors conduct their ante-mortem inspections. 83 Fed. Reg. at 4783; *see also* JA534 (FSIS Directive 6100.1, Rev. 2) (discussing establishments that "voluntarily segregate[]" animals showing signs of disease before presenting the remaining animals for inspection). At plants that perform this voluntary presorting, inspectors only conduct ante-mortem inspections of those swine that the establishment decides to offer for slaughter after the presorting. 83 Fed. Reg. at 4783. A governing agency directive to USDA employees (that is not itself codified in USDA regulations) directs USDA personnel to conduct these inspections by examining all the offered animals "at rest" and approximately 5-10% of these animals "in motion." JA534.

Plants that do this voluntary presorting under the traditional system must document their segregation procedures with USDA, and USDA inspectors must verify through observation (at least once per month) that these procedures are being followed. 83 Fed. Reg. at 4783; JA534-35. If the plant fails to file the required documentation, or fails to implement the documented procedures, it is treated as not doing voluntary presorting. JA535. And at plants without voluntary presorting,

USDA's governing directive instructs inspectors to examine all livestock offered for slaughter both at rest and in motion.  JA532.

The traditional system also includes post-mortem inspections of the "carcasses and parts" of slaughtered swine.  9 C.F.R. § 310.1(a).  These inspections occur while carcasses proceed through a plant's evisceration line, with the inspectors looking for assorted defects and signs of disease.  83 Fed. Reg. at 4783.  When inspectors spot a localized issue, they will direct plant "employees to remove the defects through trimming."  *Id.*  When they spot a broader issue, they will condemn an entire carcass.  *Id.* at 4784.

Unlike at the ante-mortem stage, at the post-mortem stage plants in the traditional system perform no voluntary presorting before inspection.  83 Fed. Reg. at 4784.  Instead, they rely on USDA personnel "to effectively control and direct their" post-mortem processing.  *Id.*  Moreover, because post-mortem inspectors need enough time to do all this activity as carcasses move through a plant's evisceration line, USDA sets evisceration "line speed" limits that cap the number of hogs that each facility can process each hour.  The specific limits vary based on the number of assigned inspectors, and on the precise configuration of the evisceration line, but with the maximum number of on-line inspectors (seven) the evisceration line speed limit for market hogs is 1,106 head per hour.  *See* 9 C.F.R. § 310.1(b)(1), (3)(ii).

3. Plants that slaughter swine are also governed by statutes that require certain humane slaughtering procedures.  One of these statutes, enacted as part of the

5

Humane Methods of Slaughter Act of 1958, Pub. L. No. 85-765, 72 Stat. 862, requires USDA to make "an examination and inspection of the method by which amenable species are slaughtered and handled in connection with slaughter" at plants where USDA does food safety inspections. 21 U.S.C. § 603(b). If these inspections reveal that a plant's slaughtering or handling is not humane, USDA can take enforcement action. *Id.* (referencing 7 U.S.C. §§ 1901-1906); *see also* 7 U.S.C. §§ 1902, 1904 (providing further information on the practices that count as humane).

### B. Factual Background

1. In the 1990s, USDA began a modernization process that was designed to improve the safety and effectiveness of USDA inspections, and that was also aimed to achieve a more efficient use the agency's resources. 83 Fed. Reg. at 4787. USDA was particularly concerned that slaughter establishments had "come to rely" on USDA "personnel to sort acceptable from unacceptable product[s]" at the post-mortem stage because they had no "mandate or incentive to remove [problematic] carcasses and parts" before they were presented to inspectors. 62 Fed. Reg. 31553, 31555 (June 10, 1997). The agency also suspected it was using disproportionate resources for post-mortem inspections on the evisceration line; believed these post-mortem inspections were using outdated procedures; and thought it might make sense to redeploy some post-mortem inspectors to points in the process where they would be more effective at preventing diseases in the food supply. *See id.*

6

Accordingly, pursuant to USDA's authority to waive applicable rules to permit experimentation, *see* 9 C.F.R. § 303.1(h), USDA in 1997 created the "HACCP-Based Inspection Models Project" or "HIMP Project." *See* 62 Fed. Reg. at 31553.[2] Under the version of the project that went forward,[3] USDA piloted a new inspection system at five different swine slaughter plants. 83 Fed. Reg. at 4787.

Ante-mortem inspection under this system was similar to the voluntary presorting already being performed at most plants under traditional inspection. Plant personnel would first do an initial sort in which they sorted and removed animals with certain conditions and disposed of them. They would then present the remaining animals for inspection by USDA inspectors, and in the process segregate out some of these animals as "suspect." USDA inspectors would then inspect all these animals and make a final decision about their disposition. USDA personnel would also inspect the establishment's presorting processes at least twice per shift (up from once per month under the traditional system). 83 Fed. Reg. at 4788.

---

[2] "HACCP" stands for "Hazard Analysis and Critical Control Point" systems, which references a 1996 USDA rule requiring that all meat and poultry establishments develop and implement a system of preventive controls designed to improve the safety of their products. *See generally* 61 Fed. Reg. 38806 (July 25, 1996).

[3] An earlier version was invalidated by the D.C. Circuit because it did not require USDA inspectors to do a post-mortem inspection of every carcass. *See American Fed'n of Gov't Emps. v. Glickman*, 215 F.3d 7, 11 (D.C. Cir. 2000). After USDA corrected that problem, the D.C. Circuit sustained the revised protocol. *See American Fed'n of Gov't Emps. v. Veneman*, 284 F.3d 125, 130-31 (D.C. Cir. 2002).

Post-mortem inspections under this system were substantially different from the traditional system. Whereas no presorting and trimming occurred at the post-mortem phase before traditional inspection, under the new system establishment personnel would do significant presorting and trimming under USDA supervision. The result was that USDA's inspections on the evisceration line would be "conducted much more efficiently and effectively," and only a maximum of three post-mortem inspectors were needed (compared to a maximum of seven in traditional inspection). *See* 83 Fed. Reg. at 4788. The inspections could also safely be performed at faster speeds, so HIMP-participating plants were allowed to exceed otherwise-applicable line speed limits. JA900. And because USDA now needed fewer personnel on the evisceration line, USDA would be able to move some inspectors to "offline" roles where they would better evaluate plants' process control, perform additional food-safety verification checks such as monitoring plant sanitation practices, and conduct additional offline work to verify that plants were treating animals humanely. *See* 83 Fed. Reg. at 4788; JA899.

After years of studying this new system through the HIMP Project, USDA in 2014 published a comprehensive report about the swine plants that had used it (the Hog HIMP Report). JA889-936. The Hog HIMP Report compared the HIMP-participating plants to comparable plants that used traditional inspection; it concluded that USDA inspectors performed more offline verification activities at the HIMP participants' plants, and that those plants had no more incidents of food-safety

8

defects than plants operating under the traditional system. 83 Fed. Reg. at 4789-90; *see also* JA893-98. USDA also later published a peer-reviewed risk assessment, which presented data suggesting that as federal inspectors increase certain offline procedures, the prevalence of *Salmonella* in market hog carcasses decreases. 83 Fed. Reg. at 4791.

2. Armed with this and other information, and following full notice-and-comment procedures, *see* 83 Fed. Reg. at 4780, USDA amended its regulations in December 2019 to create the optional "New Swine Slaughter Inspection System" for plants that slaughter market hogs. 84 Fed. Reg. at 52300. That system, which plants may opt into, closely tracks the system used during the HIMP Project. *See* 9 C.F.R. §§ 309.19, 310.1(b)(3)(i), 310.26.

Specifically, at the ante-mortem stage, plant personnel must conduct presorting activities (under preestablished written procedures that meet specified standards) to ensure that swine exhibiting signs of specified conditions are disposed of before the animals are presented for inspection. 9 C.F.R. § 309.19(a)-(c). Plants are also required to document the number of animals they exclude under this presorting, as well as the reasons for those exclusions, and then make those records available to USDA inspectors. *Id.* § 309.19(d). Plants must also "immediately notify" USDA inspectors if they have "reason to believe" that market hogs have one of various "notifiable" diseases. *Id.* § 309.19(e).

9

After this presorting, all hogs "offered for slaughter" by the plant are inspected by USDA personnel under the authority of the exact same regulatory provision that applies to traditional inspections. *See* 9 C.F.R. § 309.1; *see also* 84 Fed. Reg. at 52345 (promulgating no changes to 7 C.F.R. part 309 besides the addition of section 309.19). Ante-mortem inspections under the new system thus proceed in materially the same manner as at those many plants that were "already voluntarily conduct[ing] sorting activities" before ante-mortem inspection (as well as those operating under the HIMP Project). 84 Fed. Reg. at 52311.

At the post-mortem stage, a plant participating in the new system must conduct specified "carcass sorting activities" and defect trimming using certain written procedures, before presenting carcasses to USDA personnel. 9 C.F.R. § 310.26(b). Plants must document what they do at this stage and also make their records available to inspectors. *Id.* § 310.26(d). USDA then conducts post-mortem inspections, with the resulting online inspections utilizing between one and three inspectors, depending on various factors. *See* 83 Fed. Reg. at 4794. Because USDA can use fewer online inspectors relative to the traditional system, USDA is able to shift personnel from online to offline inspection activities "that are more effective in ensuring food safety." *Id.* at 4781.

As with the HIMP Project, USDA's new regulations eliminated existing line speed limits for post-mortem inspections under the new system. *See* 84 Fed. Reg. at 52348. But the head inspector on site can still force establishments to reduce their

10

speeds if they are operating too fast for the inspectors to perform adequate carcass-by-carcass inspections. *See id.*

### C. Prior Proceedings

1. This case was originally brought in the Western District of New York by a group of organizational plaintiffs: Farm Sanctuary, Animal Equality, and Animal Outlook (collectively "plaintiffs"), plus four other organizations that are no longer part of this case. JA13-23. All three plaintiffs identify themselves as animal rights organizations, and none contends that they operate a slaughter plant regulated by USDA. *See* JA13-16, 20.

In their operative complaint, plaintiffs brought what they called three claims for relief. JA52-56. Count I challenged the new rule's ante-mortem inspection provisions, and contended the provisions were contrary to governing statutes and arbitrary and capricious under the Administrative Procedure Act (APA). JA52-53. Count II challenged the portion of the new rule that eliminated maximum line speed limits for post-mortem inspections. JA53-54. And Count III contended that USDA failed to comply with the National Environmental Policy Act when it promulgated the entire challenged rule. JA54-56.

The government filed a motion to dismiss the case for lack of standing, which the district court denied after finding the complaint's allegations were "sufficient to support organizational standing." *Farm Sanctuary v. USDA*, 545 F. Supp. 3d 50, 52-53, 67-68 (W.D.N.Y. 2021). Thereafter, USDA filed the administrative record with the

11

court, *see* JA7, and the parties proceeded towards cross-motions for summary judgment.

At around this time, a district court in Minnesota separately invalidated the portion of USDA's rule that had eliminated line speed limits, concluding that USDA's analysis had failed to adequately address worker safety considerations. *See United Food & Commercial Workers Union, Local No. 663 v. USDA*, 532 F. Supp. 3d 741, 768-76 (D. Minn. 2021). The Minnesota court vacated that discrete portion of the rule, then remanded the matter back to USDA for further proceedings. *Id.* at 776-82.[4]

In the aftermath of that decision, plaintiffs voluntarily dismissed their challenge to the portion of the rule about line speeds (Count II), as well as their claim under the National Environmental Policy Act (Count III). JA1105. That left just plaintiffs' challenge to the ante-mortem inspection procedures, and the parties cross-moved for summary judgment on that challenge. JA8.

---

[4] Subsequently, USDA elected to gather more data about worker safety through time-limited-trials at plants that met certain conditions, and who were allowed to operate at speeds above 1,106 head per hour while the trials were ongoing. *See, e.g.,* USDA, *Special Alert: Constituent Update – November 28, 2023*, https://www.fsis.usda.gov/news-events/news-press-releases/special-alert-constituent-update-november-28-2023. USDA published data from those trials in early 2025, and simultaneously extended existing line speed waivers at participants' plants through May 15, 2025. *See* USDA, *Constituent Update – January 10, 2025*, https://www.fsis.usda.gov/news-events/news-press-releases/constituent-update-january-10-2025. Thereafter, USDA announced it was further extending the waivers and would pursue rulemaking to propose increasing the maximum evisceration line speed in plants opting into the new system. USDA, *Constituent Update – March 21, 2025*, https://www.fsis.usda.gov/news-events/news-press-releases/constituent-update-march-21-2025.

The district court granted the government's motion and denied plaintiffs'. *Farm Sanctuary v. USDA*, 706 F. Supp. 3d 381, 385 (W.D.N.Y. 2023). In doing so—in an opinion that issued before the Supreme Court decided *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024)—the district court first held that plaintiffs had Article III organizational standing. *Farm Sanctuary*, 706 F. Supp. 3d at 391-93. The court maintained that an organization could establish organizational standing whenever it could show it had elected to divert resources from "core programs and activities" that it had previously performed, in response to a new government policy that changed the status quo. *Id.* at 392-93. And the court believed that at least some of the plaintiffs had presented declarations establishing that had occurred. *See id.* The court did not address plaintiffs' alternative argument that they had associational standing. *See id.* at 390-93.

The court then rejected plaintiffs' arguments on the merits. Plaintiffs' main statutory argument asserted that the Federal Meat Inspection Act required USDA to perform ante-mortem inspections of all animals on a slaughter plant's premises, and plaintiffs claimed the new system ran afoul of this because it supposedly delegated inspection duties to plant personnel. The district court explained that the statute instead required that USDA personnel inspect only those hogs offered for slaughter, which was precisely what happened under the new system. *Farm Sanctuary*, 706 F. Supp. 3d at 394-95, 396 n.5.

13

The court also noted that to the extent plaintiffs were complaining that USDA was only observing a fraction of swine in motion (in addition to observing all animals at rest), the governing statute merely required "examination and inspection" without further detail, and did not require in-motion examination of every animal. *Farm Sanctuary*, 706 F. Supp. 3d at 395-96. And to the extent plaintiffs' arguments were based on the Humane Methods of Slaughter Act, that statute merely required an inspection of each plant's "method" of handling and slaughter, rather than an examination of every individual moment that plant personnel interact with every single hog. The new rule complied with that requirement because USDA personnel would, at various times, observe presorting by plant personnel to verify compliance with humane handling requirements. *Id.* at 396-97.

Finally, the district court rejected plaintiffs' APA argument. Applying the APA's deferential arbitrary and capricious standard, the court explained that USDA had reasonably responded to various concerns during rulemaking. The court noted that USDA had expressly considered commenters' assertions that the new rule would hurt humane handling verification, and had responded by citing data suggesting the new protocol would actually be expected to increase inspector time spent on humane verification (compared to the traditional system), particularly since the new system frees up resources previously allocated to post-mortem inspections. *Farm Sanctuary*, 706 F. Supp. 3d at 399-400, 402-03. The court also explained that USDA had reasonably decided not to mandate particular training regimens for establishment

14

sorters, since it noted it had instead prepared a guidebook, made its personnel available onsite to answer questions, and described how HIMP establishments had successfully trained their employees. *Id.* at 401-02. And the court rejected plaintiffs claim that USDA had somehow effected an unexplained "departure" from earlier positions about plant presorting: plaintiffs' argument was premised on their erroneous belief the new system "delegate[d]" ante-mortem inspection duties to establishment personnel, and USDA had adequately explained why it was adopting the optional new system instead of just offering traditional inspection. *Id.* at 403-04.

Four of the seven original plaintiffs—Farm Sanctuary, Animal Equality, Animal Legal Defense Fund, and Animal Outlook—noticed an appeal from the district court's decision. JA1108. Plaintiff Animal Legal Defense Fund then successfully moved in this Court to withdraw its participation. Only Farm Sanctuary, Animal Equality, and Animal Outlook now remain in this case as plaintiffs.

## SUMMARY OF ARGUMENT

After years of study, USDA promulgated rules to create an optional New Swine Slaughter Inspection System. The system's chief innovation was that it used updated and more efficient methods for post-mortem inspection. But aside from *increasing* USDA's attention to pre-slaughter activities, the rule made almost no changes to the agency's longstanding ante-mortem inspection procedures. The main difference was that plants in the traditional system were not required to do voluntary presorting—

15

though most still did so—while plants that opted into the new system had to commit to presorting.

Plaintiffs are three animal rights groups that do not themselves operate slaughter plants. And as the case reaches this Court, plaintiffs are only challenging the ante-mortem portions of the new rule. Plaintiffs lack standing to bring that challenge, which also fails on the merits.

Under *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), plaintiffs plainly lack organizational standing because they have not suffered an injury-in-fact. *Alliance* demonstrates that an organization cannot manufacture its own standing just by showing it feels compelled to divert resources in response to a defendant's action. Yet that is precisely what plaintiffs assert as their basis for standing, as their declarations make clear that any alleged "compulsion" they feel to reallocate resources comes from their own strongly held beliefs and not from any actions by USDA that directly affect them. The district court—operating without the benefit of the Supreme Court's decision in *Alliance*—nonetheless found standing, apparently believing a constitutionally significant "burden" occurs whenever a plaintiff previously engages in advocacy and related activities, then feels an enhanced need to do so because a new policy is even further from its preferred outcome. But that is not the law after *Alliance*.

Plaintiffs also cannot show associational standing. Only one plaintiff tried to show associational standing, and it did so only for a single member who consumes

pork products and says he fears an increased risk of foodborne illness. That member failed to link such an increased risk to the ante-mortem provisions under challenge (rather than the new rule's post-mortem provisions). And even if he had established *some* amount of increased risk, he fell well short of showing that his chance of getting a foodborne illness due to the challenged provision was so high that it was "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). Indeed, actual harm would befall that member from USDA's new ante-mortem procedures only if: (1) a diseased hog enters a plant using the new system; (2) the plant's presorters fail to identify the issue; (3) USDA's ante-mortem inspectors also fail to identify the issue, even though they inspect every hog offered for slaughter; (4) the issue is also not caught on post-mortem inspection; (5) the member happens to be the unlucky person who eventually consumes meat from this hog; and (6) the issue is one that USDA's ante-mortem inspectors would have caught under the traditional system. That highly attenuated chain is too remote to support standing.

Because plaintiffs lack Article III standing this Court need go no farther. In any event, plaintiffs' claims also fail on the merits. Their chief statutory argument is based on 21 U.S.C. § 603(a), but that statute merely requires USDA to inspect animals "before they shall be allowed to enter" an establishment "in which they are to be slaughtered" for food. The present tense formulation "are to be slaughtered" shows that USDA's ante-mortem inspections need only apply to those hogs that a plant has decided will be slaughtered, and USDA does precisely that under the new system.

17

Plaintiffs' contrary interpretation contends that USDA must somehow inspect all animals before they even arrive at a plant's gates. But that understanding runs counter to over a hundred years of USDA's unbroken interpretation; creates major textual difficulties; is based on a factually incorrect understanding of the statute's legislative history; and leads to practical consequences that plaintiffs themselves are not willing to defend. Moreover, because plaintiffs misinterpret the "are to be slaughtered" language in section 603(a), and make other textual errors, their remaining statutory arguments also fail.

Plaintiffs lastly contend that USDA acted arbitrarily and capriciously in promulgating the new rule's ante-mortem provisions. But under the APA, this Court's review is deferential, and USDA's analysis more than sufficed. As the agency explained, ante-mortem inspections under the new system are not meaningfully different from the ante-mortem inspections that were already taking place at most plants using the traditional system, as those plants employed voluntary presorting. To the extent there was a difference between these two categories, it was that the new system dedicated *more* resources to the ante-mortem stage, enabling inspectors to do *more* before slaughter to both verify humane handling and assure compliance with public health requirements. USDA further explained that its experience with the HIMP Project tended to corroborate that intuitive conclusion, and at the very least did not demonstrate that the new system was so inferior that it was not worth the

18

system's efficiency gains.  There was nothing arbitrary and capricious about that conclusion.

## STANDARD OF REVIEW

The district court granted summary judgment to the government, and this Court reviews that decision de novo.  *Murphy v. Hughson*, 82 F.4th 177, 183 (2d Cir. 2023).  Insofar as plaintiffs' standing is at issue, this Court applies the familiar summary judgment standard, and plaintiffs bear the burden of presenting affirmative evidence demonstrating their Article III standing.  *Bochner v. City of New York*, 118 F.4th 505, 518-19, 524-25 (2d Cir. 2024).  Plaintiffs' merits challenge arises under the APA, and this Court's review is thus limited to "examining the administrative record," *Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001), to determine if USDA's actions in promulgating the regulation were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706.

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing

Under Article III of the Constitution, a plaintiff must demonstrate it has standing to press each claim for which it seeks relief.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  That in turn means that (1) the plaintiff must have suffered an injury-in-fact that is concrete and particularized; (2) the plaintiff's injury must be fairly traceable to the challenged action; and (3) it must be likely, and not just speculative,

that this injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

When a plaintiff is not itself directly regulated by the action at issue, and instead just claims it has suffered an injury "from the government's allegedly unlawful regulation (or lack of regulation) of" some third party, standing becomes "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (quotation marks omitted). That admonition applies here, as all three plaintiffs are animal rights organizations that do not purport to slaughter any hogs destined for the commercial food supply.

Plaintiffs nonetheless contend they have standing under two different theories. First, all three plaintiffs assert organizational standing on the theory that USDA's rule "forces" them to redirect their resources from other activities so they can advocate against the rule. JA14; *see also* JA15, 20. Second, plaintiff Farm Sanctuary asserts associational standing on behalf of a single member who says he regularly eats pork and is concerned USDA's rule will increase his risk of foodborne illness. JA67-74. Neither theory is correct.

### A. Plaintiffs Lack Organizational Standing

1. For a plaintiff to prove its organizational standing, it must establish that it has standing "in its own right." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (quotation marks omitted). This theory of

standing treats an organizational plaintiff as "just another person," and courts apply the same three-part standing test that would apply to any individual plaintiff. *Id.*

That test forecloses organizational standing for the three animal-rights organizations that are plaintiffs here, since none can show the challenged regulation causes them any injury in fact. As the Supreme Court recently clarified in *FDA v. Alliance for Hippocratic Medicine*, an organizational plaintiff "may not establish standing simply based on the intensity of [its] interest or because [it has] strong opposition to the government's conduct." 602 U.S. 367, 394 (2024) (quotation marks omitted). Thus, when an organization has not otherwise suffered an injury-in-fact, the organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* That is, an organizational plaintiff cannot "manufacture its own standing" just by demonstrating that it will feel compelled to "divert[] its resources in response to a defendant's action." *Id.* at 394-95; *see also Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 175 (2d Cir. 2021) (recognizing that when an organization voluntarily reallocates resources in response to a government policy, the resulting impacts to the organization do not qualify as injury-in-fact).

Plaintiffs' declarations make clear that all three are attempting to manufacture organizational standing in precisely this prohibited way. The declarations all note that plaintiffs engage in activities like undercover investigations, advocacy against government policies and corporate practices they dislike, strategic litigation,

21

submission of public records requests, and various educational activities. JA60 (Animal Outlook); JA77-78 (Farm Sanctuary); JA90-92 (Animal Equality). The declarations also made clear that plaintiffs' strong policy views are what will cause them to divert resources from some existing activities to oppose the challenged rule, and to educate the public about related matters (such as by conducting more investigations at slaughterhouses, submitting more public records requests, and increasing educational outreach).[5] JA63-66, 77-78, 89-96. This injury from voluntary diversion is precisely the kind foreclosed by *Alliance*. *See also Connecticut Parents*, 8 F.4th at 175 (recognizing that when an organization campaigns against a policy to advance its social goals, the resulting costs are not involuntary and hence do not support standing).

That point is not undermined by the organizations' various assertions that they felt "forced" into these diversions or otherwise believed they lacked choice. JA63; *see also* JA77, 93. USDA has not compelled any of the plaintiffs to take any action whatsoever. Instead, it is clear from plaintiffs' declarations that any perceived "compulsion" was solely the result of plaintiffs' policy preferences, for which plaintiffs wished to vigorously advocate. *See, e.g.*, JA91-92 (assertion from Animal Equality that it "must, *in order to fulfill [its] consumer education mission*, expend additional

---

[5] Animal Outlook also asserted in its declaration that the rule will increase cruelty to pigs. JA63. This is of course not an injury to Animal Outlook and cannot establish that the organization suffered an injury in fact.

time and resources" on education activities (emphasis added)); JA76, 78 (assertion from Farm Sanctuary that USDA's rule "forces" it to divert resources to educational outreach because the rule supposedly creates public misimpressions about slaughterhouse practices, which frustrates the organization's mission of "inspir[ing] change in the way society views and treats farm animals"). In *Alliance* itself the plaintiff had claimed the challenged policy "forced" it to take various countermeasures (like research, public advocacy, and public education), and the Supreme Court dismissed that concern as insufficient. 602 U.S. at 394 (quotation marks omitted).

2. The district court nonetheless found standing, asserting that whenever a plaintiff is engaged in "core" advocacy activities that predate a government policy, that plaintiff has standing if a policy change "burdens" those activities. *Farm Sanctuary*, 706 F. Supp. 3d at 393. But the only apparent "burden" here is the kind foreclosed by the Supreme Court's later *Alliance* decision. It is thus irrelevant that plaintiffs engaged in some advocacy activities before the new rule was promulgated, and now wish to engage in even more advocacy.

Nor can plaintiffs find support in the Supreme Court's earlier decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In *Havens Realty*, the organizational plaintiff operated a housing counseling and referral service, and it sued an apartment manager that was giving false information to some prospective tenants about housing availability (allegedly for racially discriminatory reasons). *Id.* at 366-69. The Supreme

23

Court found that the plaintiff had standing because the defendants' false information about housing availability made it harder for plaintiff to operate its counseling service. *Id.* at 378-79. And as the Court subsequently explained in *Alliance*, key to that conclusion was the fact that the defendant's actions "directly affected and interfered with [the plaintiff's] core business activities," akin to when a manufacturer provides defective goods to a retailer. *Alliance*, 602 U.S. at 395. *Alliance* thus drew an important distinction between a policy that *directly affects* an organization's provision of specific services through active interference, and a policy that merely changes either an organization's incentives to provide service, or the incentives of an organization's customers to seek out that service. *See id.* (requiring an "impediment" to advocacy similar to the "direct[] affect[]' in *Havens Realty*). Indeed, the Court in *Alliance* was careful to note that *Havens Realty* was an "unusual case" that the "Court has been careful not to extend . . . beyond its context." *See id.* at 396.

To the extent any language in this Court's pre-*Alliance* cases suggest otherwise,[6] those cases do not control here. *See In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (recognizing that when intervening Supreme Court precedent "casts doubt" on earlier circuit precedent, that prior circuit precedent is no longer binding, even if the

---

[6] *See, e.g., Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (relying on *Havens Realty* for the proposition that an increase in "perceptible opportunity cost[s]" can support standing); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017) (citing *Havens Realty* to claim that there is a cognizable injury when an organization "diverts its resources away from its current activities").

24

intervening decision did "not address the precise issue decided by" the earlier panel (quotation marks omitted)). After *Alliance* courts must read *Havens Realty* narrowly, and should not extend its holding beyond situations where the challenged government policy directly and actively interferes with an organization's preexisting services.

3. No more successful is plaintiff Farm Sanctuary's claim that USDA's regulation harms its ability to operate farm sanctuaries (i.e., locations where it houses "rescued" animals, JA75-76). Farm Sanctuary reasons that the "2019 Rule" will result in more pigs being farmed for, and brought to, slaughter, which could in turn create a need for Farm Sanctuary to care for more pigs at its sanctuaries. JA78-790.

As an initial matter, this argument is just another example of plaintiffs' voluntary diversion of resources. Nothing about the rule requires Farm Sanctuary to take in a single extra pig, nor does the rule make it more costly for Farm Sanctuay to care for any pig it elects to rescue. If the rule has any effect on its sanctuary costs at all, it is because Farm Sanctuary is voluntarily choosing to respond to USDA's rule in a particular way. Farm Sanctuary thus lacks injury-in-fact.

Furthermore, this argument (and Farm Sanctuary's declaration) completely fails to link any supposed increase in costs with the new rule's ante-mortem inspection provision, and that is the only part of the rule still at issue in this case. The increased slaughter was projected to result from the rule's elimination of post-mortem line speed limits, *see* 84 Fed. Reg. at 52335, which plaintiffs no longer challenge, and not from the rule's ante-mortem provisions. So even assuming Farm Sanctuary can

establish an injury-in-fact, it cannot show that its injury is traceable to the ante-mortem provision it is challenging. Nor can it show that enjoining that provision would redress its injury.

### B. Plaintiffs Lack Associational Standing

Plaintiffs have alternatively contended that at least one of them has associational standing. The district court did not address this theory, which lacks merit.

An organization asserting associational standing is claiming that it has standing on behalf of one or more members (and not on its own behalf). *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551-52 (1996). The organization must show that (1) at least one of its members would otherwise have standing in its own right; (2) the interests it is trying to protect are germane to the organization's purpose; and (3) individual members' participation is unnecessary. *Id.* at 553.

Farm Sanctuary is the only remaining plaintiff that has tried to show associational standing, and it did so for only a single member. *See* JA59-80, 86-87; DE102 at 22.[7] That member—a chef named David Washburn—indicated that he regularly eats "a full range of pork" products and prepares pork products for others. JA68-69. Washburn's declaration further stated that because "potentially untrained

---

[7] Citations to the district court's numbered docket entries are abbreviated "DE[#] at [page]."

26

slaughterhouse employees will be examining and sorting pigs" before slaughter, he feared that there was an increased risk he would end up contracting a foodborne illness from pork products and/or that he would serve contaminated pork to his customers. JA72-73.

As an initial matter, this declaration failed to establish that Washburn (or his customers) faced *any* enhanced risk of foodborne illness from the new system's ante-mortem inspection process. Importantly, Washburn did not acknowledge that most establishments in the traditional system were already doing the voluntary ante-mortem presorting he was complaining about. *Compare* JA67-74, *with* 83 Fed. Reg. at 4783. *See also* DE102 at 22-28 (plaintiffs' summary judgment brief on standing, which also ignored this fact). Nor did Washburn attempt to quantify the relative increase in risk that he perceived as being attributable to the new rule's ante-mortem sorting procedures, rather than from other aspects of USDA's rule (which his declaration also complained about). *See* JA67-74. And Washburn did not point to evidence that any plant, not already doing voluntary ante-mortem presorting, was likely to convert to the new system. *See* JA67-74. Thus even assuming that a mere increased risk of illness could support standing, plaintiffs failed to link such a risk with the specific regulatory provision at issue—especially when one considers that the new system was actually expected to have *more* inspector involvement at the ante-mortem stage than had happened in the traditional system at the many plants with voluntary presorting. *See* 84 Fed. Reg. at 52300 (explaining that because the new system uses fewer online

27

post-mortem inspectors than the traditional system, USDA is able to reallocate some of those post-mortem inspectors to "offline inspection activities," including verifying plants' compliance with their HACCP plans); 9 C.F.R. § 417.2 (listing requirements for HACCP plans, including that they address hazards "that occur before, during, and after entry into the establishment").

Furthermore, even if plaintiffs demonstrated that Washburn faced *some* increased risk from the new ante-mortem procedures, that risk was too remote to support standing. A threatened future injury cannot support standing unless it is imminent. *Lujan*, 504 U.S. at 561. And as the Supreme Court clarified in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), that threatened injury must be "certainly impending" to count; mere evidence that future injury is "possible," or even that there is an "objectively reasonable likelihood" that the injury will occur, does not suffice. *Id.* at 409-10 (emphasis and quotation marks omitted). Plaintiffs' evidence did not show that Washburn faced a "certainly impending" risk of foodborne illness attributable to the new ante-mortem procedures. Instead, actual harm would befall Washburn from these procedures only if: (1) a diseased hog entered a plant using the new system; (2) the plant's presorters failed to identify the issue and thus failed to sort out the hog; (3) USDA's ante-mortem inspectors also failed to identify the issue, even though they inspect every hog offered for slaughter; (4) the issue was also not caught at the post-mortem stage, by either establishment personnel or USDA inspectors; (5) Washburn happens to have been the unlucky person (out of the many millions of

28

Americans who consume pork) who eventually consumed meat from this particular hog; and (6) the issue is one that USDA's ante-mortem inspectors would have caught under the traditional system. Washburn's declaration (and plaintiffs' other evidence) comes nowhere close to satisfying this "highly attenuated chain." *Id.* at 410; *see also* JA72 (vaguely saying only that Washburn had "concern" that he was at "greater risk of contracting foodborne illnesses from contaminated pork" due to the ante-mortem inspection procedures); *cf.* DE102 at 22-28 (failing to acknowledge that voluntary sorting occurs at most plants using the traditional system).

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003), does not compel a different result. As plaintiffs observed in the district court, some language in *Baur* could be read to indicate that (at least in the meat inspection context) "an increased risk of future" illness from contaminated food itself constitutes injury in fact. *Id.* at 632-36. Later Supreme Court cases, however, have clarified that merely being subject to increased risk of harm does not count as a "concrete" injury and hence cannot support Article III standing. *See Ramirez*, 594 U.S. at 435-37. The underlying harm itself (e.g. illness) could of course be a concrete injury, and if the risk of that harm is "sufficiently imminent and substantial" then the plaintiff could establish standing for prospective relief. *Id.* at 435-36 (citing, *inter alia*, *Clapper*). But absent such a showing—which plaintiffs have not made here—mere enhanced risk of harm does not suffice.

29

## II. The Challenged Rule Complies With Governing Statutes And Does Not Unlawfully Delegate Any USDA Responsibilities

Because plaintiffs lack standing, there is no need for the Court to address the merits. But if the Court reaches the issue, plaintiffs' statutory claims lack merit.

### A. The Challenged Rule Complies With The Federal Meat Inspection Act And Does Not Unlawfully Delegate USDA's Responsibilities

1. The Federal Meat Inspection Act directs USDA to use government "inspectors" to make "an examination and inspection of all . . . species [amenable to slaughter] before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce." 21 U.S.C. § 603(a). The statute further provides that if animals are "found on such inspection to show symptoms of disease," those animals must be "set apart and slaughtered separately," and their carcasses "shall be subject to a careful examination and inspection." *Id.* The challenged regulations comply with this statute because they require USDA personnel to conduct an ante-mortem inspection of all hogs that "are to be slaughtered" for food products used in commerce. Any presorting by plant employees is in addition to, and not in lieu of, USDA's inspection.

Contrary to plaintiffs' suggestion, the statute does not direct USDA to do an ante-mortem inspection of all amenable animals simply because they were brought to the premises of a company that does slaughtering. Instead, USDA's inspection must

take place before the relevant animals enter an establishment "in which they *are to be* slaughtered" for food purposes. 21 U.S.C. § 603(a) (emphasis added). The use of the present-tense formulation "are to be" indicates that, as a statutory matter, USDA's inspections need only apply to those animals that are definitively going to be slaughtered if the establishment's choices prevail. Congress choice of "verb tense is significant in construing statutes," *United States v. Wilson*, 503 U.S. 329, 333 (1992), and this Court should give effect to Congress's choice.[8]

That point is reinforced by nearby statutory language. The relevant provision opens by explaining that USDA's inspections are "[f]or the purposes of preventing the use in commerce of meat and meat food products which are adulterated." 21 U.S.C. § 603(a). It stands to reason that Congress only intended to require that USDA inspectors examine those animals the plant is actually going to slaughter for food.

Plaintiffs' alternative reading runs afoul of the principle that statutes should be construed "so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (quotation marks omitted). In plaintiffs' view, USDA inspectors

---

[8] Alternatively, one could similarly give effect to the "are to be slaughtered" language by understanding it as part of the phrase "slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered." On this understanding, the relevant place where the animals "are to be slaughtered" is the specific building where the actual slaughtering occurs; before the animal enters that building there is uncertainty about whether the animal will in fact be slaughtered for food.

must categorically inspect all hogs before they even enter a slaughter plant's premises. Br. 22-23. But if that were true, Congress would have just directed inspections of "all . . . species [amenable to slaughter] before they shall be allowed to enter into any slaughtering . . . establishment," 21 U.S.C. § 603(a), and stopped there. Congress instead qualified this directive by applying it only to animals that "are to be slaughtered" for food. *See id.* Tellingly, plaintiffs' brief does not even discuss the "in which they are to be slaughtered" language in the statute, let alone explain how that language has significance under their interpretation. *See* Br. 22-26.

Plaintiffs' approach also conflicts with USDA's longstanding and contemporaneous interpretation of the relevant language, which is "especially useful in determining the statute's meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). When Congress enacted the predecessor to 21 U.S.C. § 603(a) in 1906, Congress permitted (but did not require) ante-mortem inspections by USDA of swine "before they shall be allowed to enter into any slaughtering . . . or similar establishment, in which they are to be slaughtered and the meat" would then be used in commerce. Act of June 30, 1906, ch. 3913, 34 Stat. 669, 674; *see also* Act of Mar. 4, 1907, ch. 2907, 34 Stat. at 1260 (same). USDA issued regulations implementing this provision in 1914, and those regulations generally required inspection only after the swine had already entered the premises and were "about to be slaughtered." Bureau of Animal Indus., USDA, *BAI Order 211: Regulations Governing the Meat Inspection of the United States Department of Agriculture*, Regulation 9, § 1 (July 30, 1914) (BAI Order

32

211).[9]  USDA thus understood that inspections did not need to occur before swine entered a plant's premises, and also did not need to occur before the establishment had made a final decision about whether to offer the swine for slaughter (i.e. it applied only to those swine "about to be slaughtered").  That basic interpretation then prevailed for the next half-century.  *See* 9 C.F.R. § 309.1(a)-(b) (1967).

Congress amended the statute in 1967 to make ante-mortem inspections mandatory rather than permissive, but it still retained the key "in which they are to be slaughtered" language that had appeared in the original statute.  *See* Pub. L. No. 90-201, § 3(b), 81 Stat. at 588.  USDA responded with new regulations in 1970, and those regulations carried forward USDA's earlier understanding.  *See* 35 Fed. Reg. 15552, 15563 (Oct. 3, 1970) (promulgating a revised version of 9 C.F.R. § 309.1(a)-(b), which expressly required ante-mortem inspection only for those animals the establishment "offered for slaughter," and which indicated the inspections would normally be performed after the animals had already entered the plant's premises).  And that same understanding has prevailed through the present day, unaltered by USDA's 2019 rule. *See, e.g.*, 9 C.F.R. § 309.1 (2018); 9 C.F.R. § 309.1 (2024).  Plaintiffs' contrary interpretation thus flies in the face of over a hundred years of settled understanding, which Congress has never disturbed.

---

[9] *Available at* https://perma.cc/95KZ-8MSB.  In some circumstances the 1914 regulation allowed USDA inspectors to do inspections in public stockyards, but even then the inspections were only conducted on those "animals presented for inspection" by the slaughterer.  *See* BAI Order 211, Regulation 9, § 1.

33

Plaintiffs' interpretation would also create practical issues. As plaintiffs acknowledge, animals have been understood to be on a plant's premises once the delivery truck arrives at the gate. Br. 23. If USDA personnel had to inspect all animals before that point, there could be a significant time gap between USDA's inspection and the actual slaughter—increasing the chance that a previously healthy animal might develop a condition after inspection but before slaughter, thereby increasing the risk to the food supply. Unwilling to accept that consequence (which would also be inconsistent with typical current practice, even under traditional inspection), plaintiffs defend their interpretation by resorting to the self-described "legal fiction" that "animals kept in holding pens immediately after delivery" to an establishment have not yet "entered" that establishment. Br. 30. But the fact that plaintiffs must resort to a wholly atextual "legal fiction" just to make their interpretation workable is a strong indication that they have misinterpreted the statute. And it is in any event wholly unclear why animals kept in holding pens immediately after delivery have not yet "entered the establishment," yet animals transferred from these initial pens to other nearby pens are in a different category. USDA's time-tested interpretation works seamlessly without any need for such fictions or difficulties.

2. To reach their contrary result, plaintiffs primarily rely on a misreading of *National Meat Ass'n v. Harris*, 565 U.S. 452 (2012). *See* Br. 23-26. At issue in *National Meat* was a provision in the Federal Meat Inspection Act that preempted various state laws "within the scope" of Title 21, Chapter 12, of the U.S. Code. *See* 21 U.S.C.

§ 678; *National Meat*, 565 U.S. at 458 (quotation marks omitted). The Court held that this preempted a state law restricting the slaughter of nonambulatory animals, *National Meat*, 565 U.S. at 458-59, and in doing so the Court described the scope of the entire Federal Meat Inspection Act (including provisions of the Humane Methods of Slaughter Act codified in Chapter 12) as encompassing both animals that were going to be slaughtered for food, and other animals "on a slaughterhouse's premises." *Id.* at 456, 465. The Court specifically noted that USDA regulations prohibit slaughter of animals with certain conditions, and also observed that 21 U.S.C. §§ 603(b) and 610(b) imposed humane handling requirements that (as articulated in USDA rules) "apply throughout the time an animal is on a slaughterhouse's premises." *National Meat*, 565 U.S. at 466.

Nothing about the decision purported to interpret the portions of 21 U.S.C. § 603(a) at issue here. The sole time the decision cited section 603(a) was for the uncontroversial proposition that the Federal Meat Inspection Act "applies to all slaughterhouses producing meat for interstate and foreign commerce." *National Meat*, 565 U.S. at 455 n.1. Plaintiffs imply otherwise, but their various quotations and citations to *National Meat* are to portions of the opinion that described USDA's regulations or that made broader statements about the "scope" of the entire statutory scheme; they are not cites to any discussion of the relevant statutory provision. *See* Br. 23, 25, 26.

35

Plaintiffs also offer a legislative history argument, but they make critical historical errors. In plaintiffs' telling, the 1906 Congress acted to "mandat[e] a pre-entry inspection, not just a pre-slaughter inspection" and did so to "bar regulated slaughter establishments from possessing animals, or even coming in contact with animals, until" USDA inspectors "had independently determined they were healthy." Br. 27. Plaintiffs further claim that inspections at the time were done in public stockyards "before slaughter establishments . . . could possess and make decisions about the animals." *Id.* But the 1906 and 1907 versions of the statute mandated no ante-mortem inspections *at all*, instead leaving the matter to USDA's discretion. 34 Stat. at 674; *see also* 34 Stat. at 1260 (same). And USDA's 1914 regulations demonstrate that, as a default matter, inspections in that era were to be done on the premises of a slaughterhouse, and only when the animal was "about to be slaughtered." BAI Order 211, Regulation 9, § 1. USDA in some circumstances did permit inspections at public stockyards, but those inspections were not independent of the establishments as they were "performed only on animals presented for inspection" by those establishments. *Id.* And plaintiffs cannot overcome these authoritative sources merely by citing snippets of testimony during a congressional hearing that predated enactment of both the 1906 and 1907 statutes, and that necessarily could not have been describing the inspection system USDA later implemented for those statutes. *See* Br. 27-29.

36

Finally, plaintiffs worry that when plant employees do initial presorting activities, those employees might sort out animals with contagious diseases and yet not notify USDA about an issue with broader health implications. But regulations under the new system specifically require that plant employees immediately notify USDA whenever they encounter evidence of certain diseases. *See* 9 C.F.R. § 309.49(e). Plant employees must also tag or otherwise identify any swine they exclude, document the reason for the exclusion, and make these records available to USDA inspectors. *See id.* § 309.49(c)-(d). And as previously discussed, USDA inspectors conduct verification activities to ensure that the plants are complying with these requirements.

3. Plaintiffs also offer variations on their basic statutory argument. First, they contend that the regulation violates "separation-of-powers principles" because it delegates "broad, non-ministerial responsibilities" to plant employees, when Congress had instead delegated those powers only to USDA. Br. 38-40. But this argument is easily dispensed with because it is just another version of plaintiffs' erroneous statutory argument. As already explained, USDA's statutory duty is to conduct an ante-mortem inspection of all swine that "are to be slaughtered" for food, which USDA does under the new system. Any presorting done by plant employees is additional to, and not a delegation of, USDA's statutory responsibilities. So there is no separation-of-powers issue at all.

37

Second, plaintiffs contend the new ante-mortem provision does not comply with a separate portion of section 603(a) describing what happens when disease symptoms are identified. Br. 33-35. In plaintiffs' view, that portion of the statute requires USDA inspectors to be the ones who identify diseases, and who determine which animals must be set aside and slaughtered separately. But this ignores section 603(a)'s structure. The first clause directs USDA personnel to inspect animals that "are to be slaughtered" for food. 21 U.S.C. § 603(a). The second clause then says that animals "found on *such inspection* to show symptoms of disease shall be set apart and slaughtered separately" from other animals. *Id.* (emphasis added). Inspectors' obligations under the second clause thus only apply to a USDA inspection that occurs under the first clause ("such inspection"). Those obligations do not apply to activities by establishments that occur before USDA's inspections.

## B. The Challenged Rule Complies With The Humane Methods Of Slaughter Act

Section 603(b), a portion of the Humane Methods of Slaughter Act, directs USDA to use its inspectors to make "an examination and inspection of *the method* by which amenable species are slaughtered and handled in connection with slaughter in the slaughtering establishments" it is inspecting for food safety purposes. 21 U.S.C. § 603(b) (emphasis added). Under both the traditional system, and the new system, USDA does precisely that—its inspectors periodically perform verification checks to see if the "the method" used by the establishment for slaughtering and handling

38

complies with various requirements, including humane handling requirements. *See, e.g.*, 84 Fed. Reg. at 52312 (noting that USDA inspectors under the new system "will observe establishment employees" while they do sorting, and as a part of this will "verify that animals that are intended to be disposed of are humanely euthanized"); JA545, 548 (USDA's subregulatory implementing directive for the new system, which directs inspectors to "verify the establishment meets humane handling requirements" in accordance with Directive 6900.2)); JA527, 532 (USDA's subregulatory implementing directive for the traditional system, which also directs personnel to do humane handling verification in accord with Directive 6900.2); JA562, 570, 572-77 (Directive 6900.2, which directs inspectors to periodically evaluate humane handling at numerous different ante-mortem stages). Indeed, one of the advantages of the new system is that it frees up agency resources that previously had been dedicated to post-mortem inspection, then reallocates some of them to do additional "humane handling verification tasks . . . as compared to traditional inspection." 84 Fed. Reg. at 52315; *see also id.* at 52336.

Plaintiffs are nonetheless worried that some individual hogs, identified by establishment personnel as unfit for slaughter, may be disposed of by establishment personnel outside the view of USDA inspectors and in an inhumane manner. *See* Br. 36-37. But nothing in section 603(b) requires USDA to verify, through direct observation, that each individual hog is humanely slaughtered. The statute instead

39

merely requires USDA to examine the general "method" each establishment uses. *See* 21 U.S.C. § 603(b).

That point is reinforced by the contrast between section 603(a)—which specifically directs USDA to inspect "*all* amenable species" before slaughter for food safety purposes, 21 U.S.C. § 603(a) (emphasis added)—and section 603(b), which omits the word "all" before "amenable species" when describing humane treatment inspections. *Id.* § 603(b). Moreover, subsequent language in section 603(b) says that if USDA concludes an establishment has slaughtered any animals inhumanely, USDA has discretion to stop food safety inspections until the establishment "furnishes assurances *satisfactory to [USDA]* that all slaughtering and handling" will be humane. *Id.* (emphasis added). By specifically giving USDA discretion about the kinds of assurances needed, the statute recognizes that USDA need not directly observe every moment, for every animal, from arrival to slaughter.

## III. USDA Did Not Act Arbitrarily And Capriciously In Promulgating The New Rule's Ante-Mortem Provision

Under both the traditional system, and the new system, ante-mortem inspection is governed by 9 C.F.R. § 309.1. That regulation articulates USDA's long-held view that USDA must inspect "[a]ll livestock offered for slaughter;" further indicates that the inspection occurs "on the premises of the establishment," and clarifies that inspection normally occurs "on the day of and before slaughter." *Id.* That regulation was not altered in any way by the new system. And under its

40

authority, as previously noted, most establishments had already been doing voluntary presorting activities under the traditional system.

The main ante-mortem difference between the new and old systems is that plants in the traditional system were not required to do voluntary presorting—though most still did so—while plants that opted into the new system had to commit up front to undertake presorting. Most of the other regulatory changes in the new system related to making post-mortem inspection more efficient, and those changes were expected to *increase* the resources directed to ante-mortem inspection through reallocated agency resources. And in view of that reality, the agency concluded that commenters' concerns about humane handling, and about health effects, were not enough to derail the rule.

That conclusion should be sustained. Under the APA's arbitrary and capricious standard, *see* 5 U.S.C. § 706(2)(A), judicial review is "narrow," and courts must be careful to "not substitute their judgment for that of the agency." *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007) (quotation marks omitted). Thus, "so long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made," the agency's action will be upheld. *Id.* at 268. Moreover, even an agency opinion of "less than ideal clarity" can suffice, so long as "the agency's path may reasonably be discerned."

41

*Dibble v. Fenimore*, 545 F.3d 208, 219 (2d Cir. 2008) (quotation marks omitted).[10]

USDA's rule easily passes muster under that deferential standard.

1. As USDA explained, the agency was switching to the new inspection system primarily because it allowed inspections to be more effective and efficient with available resources and would also allow establishments greater flexibility and efficiency in their operations. 84 Fed. Reg. at 52300. This was because the new system shifted inspectors away from post-mortem inspection—where they had been less effective at preventing foodborne illness and of course would have little or no role in enforcing humane handling requirements—and towards ante-mortem activities that are "more effective in ensuring food safety . . . [and] humane handling requirements." *Id.* The new regulation also had the potential of allowing establishments to operate at higher line speeds, which USDA expected would increase the efficiency of their operations and have economic benefits. *See* 83 Fed. Reg. at 4812-13.

---

[10] Citing one sentence in the district court's opinion, plaintiffs say the court erroneously thought arbitrary and capricious review was "akin to non-reviewability." *See Farm Sanctuary*, 706 F. Supp. 3d at 398 (internal quotation marks omitted); Br. 41-42. But the court's subsequent articulation of the arbitrary and capricious standard was entirely correct. *See id.* (recognizing that the court's job was not to reweigh the evidence, and instead just to make sure the agency had "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation" (quotation marks omitted)). That correct articulation was what the court then applied in evaluating and rejecting plaintiffs' arguments. *See id.* at 399-404.

The agency further recognized that under the traditional system, most establishments were already doing voluntary presorting, and for those establishments the new rule's ante-mortem procedures "are virtually the same." 84 Fed. Reg. at 52311-12; *see also* 83 Fed. Reg. at 4783. Moreover, because the new system was specifically designed to reallocate some post-mortem inspectors to ante-mortem duties, including humane handling verification tasks, the agency reasonably expected that the new system would "improve animal welfare and compliance with the" Humane Methods of Slaughter Act. 84 Fed. Reg. at 52300; 83 Fed. Reg. at 4781.

The agency also explained that this intuitive prediction was consistent with data obtained from participants in the HIMP Project (i.e. establishments using procedures similar to the new system). *See* 84 Fed. Reg. at 52315. That data, obtained from an internal agency tracking system, showed that USDA inspectors "spent more time verifying that specific humane handling and slaughter requirements were met in HIMP market hog establishments than in non-HIMP market hog establishments." 83 Fed. Reg. at 4790. It additionally showed that the rate of documented humane noncompliance at the HIMP establishments (11 instances at five establishments) was lower than the rate at comparator non-HIMP establishments (117 instances at 21 establishments), and none of the documented HIMP noncompliance events involved hogs "being forced to move faster than normal walking speeds to keep up with faster evisceration line speeds." *Id.* at 4790-91. The agency cautiously extrapolated from

43

this data that "increased offline inspection" from the new system "may improve" facilities' compliance with humane slaughter rules. *Id.* at 4791.

Plaintiffs mount an attack on what they call USDA's conclusion that the new system would "improve humane handling." Br. 43. But as an initial matter, this incorrectly frames the arbitrary and capricious inquiry. USDA created the new inspection system largely for reasons of agency and plant efficiency. While it also anticipated the new system would improve food safety and humane handling, those expected improvements were unnecessary to justify USDA's decision. *See* 84 Fed. Reg. at 52309 (explaining that the point of examining data from HIMP establishments was just to see if the HIMP system performed "as well as" traditional inspection and noting that USDA did not believe the HIMP system needed to be shown as "superior" in order for the rule to be justified).

Plaintiffs also miss the boat entirely in trying to nitpick the HIMP data for various claimed defects. They fault the agency for not specifically designing the HIMP study to examine humane treatment issues, *see* Br. 44-45, but the agency acknowledged that this issue was not addressed in the HIMP Report, then explained that it decided to gather additional data from other sources. *See* 83 Fed. Reg. at 4790. Plaintiffs point to various criticisms that have been leveled about the first iteration of the HIMP Report, *see* Br. 45-46, but the cited criticisms had nothing to do with

44

humane verification. *See* JA856-59[11] (2013 Government Accountability Office report, raising concerns about USDA's ability to draw inferences about food safety from the then-current version of the HIMP study); JA813-15 (2013 Inspector General report, which is also about food safety inferences). Moreover, USDA later completed its Hog HIMP Report with the benefit of these analyses and accounted for them. *See* JA889 (November 2014 final report); 83 Fed. Reg. at 4788-90. And in the Federal Register, USDA responded at length to various criticisms about its study design, ultimately concluding that while the study design was not perfect, the agency was working within "real-world conditions and limitations," had worked hard to compare the HIMP participants only to similar non-HIMP participants, and ultimately gathered data that had some use. 84 Fed. Reg. at 52309 (quotation marks omitted).

Plaintiffs also take issue with the agency's internal data on humane treatment violations, theorizing alternate explanations for why that data might show fewer humane treatment issues at HIMP plants. Br. 46-48. But USDA's task was not to eliminate all possible doubt before making a decision; it was instead to make a reasonable judgment with the available data. USDA did so, especially after accounting for the obvious: the new inspection system was expected to *increase* the number of

---

[11] Plaintiffs' brief actually cites page JA839, *see* Br. 45, but the quoted passage is discussing a different USDA study about chicken plants. *See* JA839. This brief instead cites the report's discussion of swine plants.

man-hours that USDA dedicated to humane handling verification tasks and hence was expected to improve the agency's enforcement of humane handling requirements.

Plaintiffs are also wrong on the substance. They claim that an Inspector General study established that humane tracking data is collected differently in "HIMP and non-HIMP establishments." Br. 47-48 (citing Office of Inspector Gen., USDA, *Food Safety and Inspection Service Followup on the 2007 and 2008 Initiatives: Audit Report 24016-0001-23*, at 28 (June 2017), https://perma.cc/CFP7-XCKG. But neither the term "HIMP," nor even any reference to "traditional inspection," appears in that report (let alone the cited page). Instead, the report discusses ways that reporting at "smaller establishments" differs from reporting at larger establishments. *See* Office of Inspector Gen., *supra*, at 48-49. That is irrelevant here, because when USDA looked at humane tracking data, it compared the data from the five (large) HIMP plants with data from "21 comparable *large* non-HIMP" establishments. 83 Fed. Reg. at 4790 (emphasis added).

To the extent plaintiffs suggest USDA only looked at "cherry-picked" internal data, Br. 45, their objection is hard to understand. USDA looked at nearly three years' worth of data (January 2013 through September 2015), which it pulled from agency databases. 83 Fed. Reg. at 4790. Plaintiffs give no reason to think there was something atypical about those years, and USDA explained when promulgating the final rule that inspection procedures were relatively stable between 2006 and 2019, *see* 84 Fed. Reg. at 52307.

46

Plaintiffs fare no better with their argument from "common sense." Br. 49. They claim that because all animals are supposedly inspected by USDA under the traditional system, this gives inspectors more opportunities to observe how plant employees have handled every animal. *Id.* But as has been repeatedly discussed, most plants using the traditional system were already doing voluntary presorting, just as occurs in the new system. For the majority of plants, then, the new system unambiguously represents an improvement because it increases the inspection resources devoted to humane handling. And at those few plants that did not already do voluntary presorting, the lack of presorting would just mean that USDA inspectors did an ante-mortem *food-safety* inspection of more animals, at just one step in the handling process, where any humane verification activities will largely be incidental to the food-safety inspection. Humane verification activities also occur at many other steps between arrival and slaughter, *see* JA532, and the new system allocates more resources to those other steps collectively as compared to traditional inspection. Common sense thus strongly indicates that the new system would be expected to improve humane handling verification, and it was not arbitrary for USDA to so conclude.

Similar points answer plaintiffs' related concern that animals deemed "[u]nfit" by establishment employees will be mistreated during presorting. Br. 52. Because presorting occurs at most plants under the traditional system, this claimed problem would occur even without the new inspection system. And since the new inspection

47

system would dedicate additional resources to policing treatment during presorting, as compared to the resources dedicated to the task under the traditional system, the new system would be expected to better address the problem plaintiffs identify. Plaintiffs nonetheless complain that USDA's analysis did not specifically address mistreatment during the presorting process. But USDA explained that (1) ante-mortem sorting under the new system is very similar to how such sorting already occurred at most plants in the traditional system, and (2) the new system would increase the amount of USDA resources dedicated to humane handling enforcement through the entire ante-mortem process. There was thus no need from USDA to specifically address humane treatment of unfit animals.

Finally, plaintiffs fear that the new system will make it harder to enforce the 28-Hour Law, a statute that governs certain kinds of animal transport and generally prohibits animals from being confined for more than 28 consecutive hours. *See* 49 U.S.C. § 80502. They reason that the sooner USDA inspectors see animals after arrival at a plant, the more likely it is that the inspectors will detect signs of exhaustion and dehydration, which might prompt further investigation by USDA personnel. Br. 54-56. Plaintiffs then claim that in the traditional inspection system, inspectors doing ante-mortem inspections are better able to look for these signs.

Plaintiffs fail to identify even a single comment making this point during rulemaking proceedings, so it is unsurprising that USDA did not specifically discuss the 28-Hour Law. Plaintiffs in any event significantly misunderstand USDA's

48

inspections. Under both the traditional system and the new system, USDA's guidance directs personnel to look for signs of exhaustion and dehydration as part of their observations of truck unloading. JA567 (encouraging USDA inspectors to take follow-up actions related to the 28-Hour Law if they notice that livestock "*arriving on a transport vehicle* appear exhausted or dehydrated (emphasis added)). And as plaintiffs themselves acknowledged in the district court, observations at the truck unloading stage are distinct from any humane verification tasks performed during ante-mortem food safety inspections—which are usually not even conducted until the day of slaughter, after animals have been put into holding pens where they have access to water and can rest. *See* JA569, 573-75 (distinguishing between humane verification activities conducted during truck unloading and those conducted during ante-mortem inspection); JA532; 9 C.F.R. §§ 309.1(a), 313.2; *see also* DE92-1 at 44 (plaintiffs' summary judgment brief, stating that USDA's observations related to the 28-Hour Law occur "prior to ante-mortem inspections"). The new system does not decrease the verification tasks performed at the truck unloading stage. It would instead tend to increase the tasks performed at that stage because it reallocates USDA resources from post-mortem inspection to humane verification.

2. Plaintiffs' final argument accuses USDA of failing to justify its purported "change in policy" on ante-mortem inspections, without adequately explaining why the supposedly "new" policy would sufficiently address food safety. Br. 56-57. But plaintiffs misunderstand the very limited ways in which the new system changed ante-

49

mortem inspections. And USDA more than adequately explained why it thought its new system sufficiently protected public health.

The only regulatory change effected by the new system regarding ante-mortem inspection is codified in 9 C.F.R. § 309.19. That regulation makes plant presorting mandatory for establishments that voluntary choose to use the new system, *see id.* § 309.19(a), and couples that election with mandatory recordkeeping and reporting requirements, *see id.* § 309.19(b)-(e). The new system also includes significant changes regarding post-mortem inspection, as previously noted, but the effect of those changes is to increase the agency resources dedicated to ante-mortem inspection, including for tasks designed to enhance food safety. *See* 84 Fed. Reg. at 52300; 83 Fed. Reg. at 4781.

Thus at least from an ante-mortem standpoint, any "changes" wrought by the new system would be expected to enhance food safety. And that is exactly what USDA thought. *See* 84 Fed. Reg. at 52311 (noting that most establishments were already doing voluntary ante-mortem presorting under the traditional system, and that the ante-mortem procedures under the new system "are virtually the same"); *id.* at 52300 (explaining that the new system allowed USDA to reallocate resources from post-mortem, on-line inspections, to "more offline inspection activities that are more effective in ensuring food safety"). Indeed, USDA cited evidence from the HIMP Project to conclude that even after accounting for the reduced (but more efficient)

50

staffing at the post-mortem stage, the overall effect of the new system was that it performed at least as well as the traditional system. *See id.* at 52309.

Plaintiffs level various arguments about the HIMP data and pilot program, but most of these concerns appear to go to the rule's post-mortem changes rather than its ante-mortem changes. *See* Br. 57-58 (discussing statistical concerns with USDA's data on *Salmonella*, but never explaining why the rule's ante-mortem changes would lead to increased *Salmonella* rates); Br. 58 (discussing an Office of Inspector General audit, which identified issues that were either specifically about post-mortem inspection, or that failed to differentiate between the two, *see* JA813-15); Br. 58-59 (discussing a comment which claimed that non-HIMP plants had fewer noncompliance records than HIMP plants, and also asserted that some types of health verification tasks were more common at non-HIMP plants than at HIMP plants, but then either specifically linked these concerns to post-mortem inspection or failed to differentiate, *see* JA992, JA996-1000); Br. 60 (discussing several USDA's inspectors' observations at HIMP plants, almost of all which related to post-mortem inspections, *see* JA341-42, JA345-51, JA354-56). Regardless, USDA responded at length to these various criticisms. It reasonably concluded that the data from the HIMP program was useful and supportive, even if imperfect, and that it supported the idea that HIMP had not led to worse health outcomes. *See* 84 Fed. Reg. at 52305-11. USDA also noted that (1) even though there were some areas where HIMP plants had more documented non-compliance, in the areas most strongly related to public health the HIMP plants

51

performed significantly better; (2) additional *documented* noncompliance at HIMP

plants could well be explained by the fact the HIMP system provides substantially

more opportunities for offline inspection activities; (3) evidence from the HIMP

Report indicated that inspectors at HIMP plants performed more of the verification

tasks most closely associated with public health, which was what mattered most; and

(4) for some other categories (e.g. verifying compliance with corrective action plans),

increased verifications at non-HIMP plants could actually signal underlying *problems* at

those plants (e.g. because a corrective action plan was needed in the first place).  *See id.*

at 52307-09.

      To the extent plaintiffs make arguments linked to ante-mortem inspection,

their arguments have obvious flaws.  They cite a comment asserting that at HIMP

plants, USDA ante-mortem inspectors flagged a lower percentage of pigs as "U.S.

Suspect" than at a set of non-HIMP plants (some of which apparently did not do

voluntary pre-sorting).  *See* Br. 58-59 (citing JA991); 83 Fed. Reg. at 4783, 4787-88

(explaining that "U.S. Suspect" is a designation only given by USDA inspectors).  But

that is of course precisely what one would expect if plant presorting effectively

removes some sick animals.  Plaintiffs also complain that USDA did not mandate

specific kinds of training for plant presorters, Br. 60, but USDA responded to this by

noting that it would provide a sorting guide, that USDA personnel would be onsite to

answer questions, and that the HIMP Project suggested overall performance under

the new system would be at least as good as overall performance under the traditional

system. 84 Fed. Reg. at 52312-13. And while plaintiffs express concern that not all animals are inspected in motion under the new system, Br. 60-61, that was *also* true under the traditional system at all plants with voluntary presorting, *see* JA534. Nothing about the new regulations altered, in any way, USDA's subregulatory directive about the percentage of swine that must be examined in motion at a facility that does presorting.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

BRIGHAM J. BOWEN
  *Associate General Counsel*
  *U.S. Department of Agriculture*

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

MICHAEL DIGIACOMO
  *United States Attorney*

THOMAS PULHAM
  *s/ Benjamin M. Shultz*
BENJAMIN M. SHULTZ
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3518*
  *Benjamin.Shultz@usdoj.gov*

April 2025

53

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 12,848 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Benjamin M. Shultz*
Benjamin M. Shultz

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the Court's electronic filing system.  Service will be accomplished by the Court's electronic filing system.

*s/ Benjamin M. Shultz*
Benjamin M. Shultz

**ADDENDUM**

# TABLE OF CONTENTS

21 U.S.C. § 603 ................................................................................................ A1

Act of June 30, 1906, ch. 3913, 34 Stat. 669, 674 (excerpts) .......................... A2

Act of Mar. 4, 1907, ch. 2907, 34 Stat. 1256, 1260 (excerpts) ....................... A3

Wholesome Meat Act, Pub. L. No. 90-201, 81 Stat. 584 (1967) (excerpts) ............... A4

9 C.F.R. § 309.1 .............................................................................................. A5

9 C.F.R. § 309.19 ............................................................................................ A6

**21 U.S.C. § 603**

**§ 603. Examination of animals prior to slaughter; use of humane methods**

(a) Examination of animals before slaughtering; diseased animals slaughtered separately and carcasses examined

For the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce; and all amenable species found on such inspection to show symptoms of disease shall be set apart and slaughtered separately from all other cattle, sheep, swine, goats, horses, mules, or other equines, and when so slaughtered the carcasses of said cattle, sheep, swine, goats, horses, mules, or other equines shall be subject to a careful examination and inspection, all as provided by the rules and regulations to be prescribed by the Secretary, as provided for in this subchapter.

(b) Humane methods of slaughter

For the purpose of preventing the inhumane slaughtering of livestock, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of the method by which amenable species are slaughtered and handled in connection with slaughter in the slaughtering establishments inspected under this chapter. The Secretary may refuse to provide inspection to a new slaughtering establishment or may cause inspection to be temporarily suspended at a slaughtering establishment if the Secretary finds that any cattle, sheep, swine, goats, horses, mules, or other equines have been slaughtered or handled in connection with slaughter at such establishment by any method not in accordance with the Act of August 27, 1958 (72 Stat. 862; 7 U.S.C. 1901-1906) until the establishment furnishes assurances satisfactory to the Secretary that all slaughtering and handling in connection with slaughter of livestock shall be in accordance with such a method.

A1

**Act of June 30, 1906, ch. 3913, 34 Stat. 669, 674 (excerpts)**

. . .

That for the purpose of preventing the use in interstate or foreign commerce, as hereinafter provided, of meat and meat food products which are unsound, unhealthful, unwholesome, or otherwise unfit for human food, the Secretary of Agriculture, at his discretion, may cause to be made, by inspectors appointed for that purpose, an examination and inspection of all cattle, sheep, swine, and goats before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products therefor are to be used in interstate or foreign commerce; and all cattle, swine, sheep, and goats found on such inspection to show symptoms of disease shall be set apart and slaughtered separately from all other cattle, sheep, swine, or goats, and when so slaughtered shall be subject to a careful examination and inspection, all as provided by the rules and regulations to be prescribed by the Secretary of Agriculture as herein provided for.

. . .

**Act of Mar. 4, 1907, ch. 2907, 34 Stat. 1256, 1260 (excerpts)**

. . .

FOR MEAT INSPECTION: That hereafter, for the purpose of preventing the use in interstate or foreign commerce, as hereinafter provided, of meat and meat food products which are unsound, unhealthful, unwholesome, or otherwise unfit for human food, the Secretary of Agriculture, at his discretion, may cause to be made, by inspectors appointed for that purpose, an examination and inspection of all cattle, sheep, swine, and goats before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products therefor are to be used in interstate or foreign commerce; and all cattle, swine, sheep, and goats found on such inspection to show symptoms of disease shall be set apart and slaughtered separately from all other cattle, sheep, swine, or goats, and when so slaughtered shall be subject to a careful examination and inspection, all as provided by the rules and regulations to be prescribed by the Secretary of Agriculture, as herein provided for.

. . .

**Wholesome Meat Act, Pub. L. No. 90-201, 81 Stat. 584 (1967) (excerpts)**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That this Act may be cited as the Wholesome Meat Act and that the provisions appearing under the subheading "FOR MEAT INSPECTION:" under the heading "BUREAU OF ANIMAL INDUSTRY" in the Act approved March 4, 1907, entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June thirtieth, nineteen hundred and eight" (34 Stat. 1260-165, as amended; 21 U.S.C. 71-91), are hereby designated as the "Federal Meat Inspection Act"; the first twenty paragraphs therefor are hereby designated, respectively, as sections 3 through 22, and the twenty-first and twenty-second paragraphs therefor as section 23; and said sections 3 through 23 are hereby designated as "TITLE I—INSPECTION REQUIREMENTS; ADULTERATION AND MISBRANDING".

. . .

SEC. 3. Said Act is hereby further amended by—

  (a) deleting the phrase "interstate or foreign" wherever it appears in sections 3 through 23 of title I of said Act; and

  (b) deleting in section 3 of said Act (21 U.S.C. 71) the phrase "the Secretary of Agriculture, at his discretion, may" and inserting in lieu thereof the words "the Secretary shall" and deleting the words "of Agriculture" wherever the appear after the word "Secretary" thereafter in title I of the Act.

. . .

A4

**9 C.F.R. § 309.1**

**§ 309.1. Ante-mortem inspection on premises of official establishments.**

(a) All livestock offered for slaughter in an official establishment shall be examined and inspected on the day of and before slaughter unless, because of unusual circumstances, prior arrangements acceptable to the Administrator have been made in specific cases by the circuit supervisor for such examination and inspection to be made on a different day before slaughter.

(b) Such ante-mortem inspection shall be made on the premises of the establishment at which the livestock are offered for slaughter before the livestock shall be allowed to enter into any department of the establishment where they are to be slaughtered or dressed or in which edible products are handled. When the holding pens of an official establishment are located in a public stockyard and are reserved for the exclusive use of the establishment, such pens shall be regarded as part of the premises of that establishment and the operator of the establishment shall be responsible for compliance with all requirements of the regulations in this subchapter with respect to such pens.

**9 C.F.R. § 309.19**

**§ 309.19. Market hog segregation under the new swine slaughter inspection system.**

(a) The establishment must conduct market hog sorting activities before the animals are presented for ante-mortem inspection. Market hogs exhibiting signs of moribundity, central nervous system disorders, or pyrexia must be disposed of according to paragraph (c) of this section.

(b) The establishment must develop, implement, and maintain written procedures to ensure that market hogs exhibiting signs of moribundity, central nervous system disorders, or pyrexia do not enter the official establishment to be slaughtered. The establishment must incorporate these procedures into its HACCP plan, or sanitation SOPs, or other prerequisite programs.

(c) The establishment must identify livestock that establishment employees have sorted and removed from slaughter with a unique tag, tattoo, or similar device. The establishment must develop, implement, and maintain written procedures to ensure that the animals sorted and removed from slaughter do not enter the human food supply and are disposed of according to 9 CFR part 314.

(d) The establishment must maintain records to document the number of animals disposed of per day because they were removed from slaughter by establishment sorters before ante-mortem inspection by FSIS inspectors and the reasons that the animals were removed. These records are subject to review and evaluation by FSIS personnel.

(e) The establishment must immediately notify FSIS inspectors if the establishment has reason to believe that market hogs may have a notifiable animal disease. Notifiable animal diseases are designated by World Animal Health Organization.